May it please the Court, my name is Anders Johnson. I represent the petitioner in this matter, and I think basically this is a case about the one-child policy, the course of population-controlled China, and whether a spouse of a woman who was forced to have an abortion has met his burden in showing not only a forced abortion, but also whether he, in and of himself, has resisted and been persecuted because of the one-child policy. I think that in this case he, in fact, did show not only that he resisted the policy himself, but also that he, himself, has suffered persecution. So what resistance did he show? Well, the first thing he did was that he, with his spouse, married, informally married. And marriage alone is going to be his resistance? No. Take it from me, Canby, I'll tell you. Strike that, would you please? The Court has found, and this Court has found in the past, that getting married underage, the law that requires a certain age before you get married, is part of the one-child policy. He resisted that policy by not only getting married, but also having children. We have underage marriage laws in this country, in many states. If kids went in West Virginia and got married in violation of that, would they be entitled to asylum someplace else? No. But what he also did was he had a child, which was against the law in China, while not married. He, in fact, was in Canby. So an out-of-wedlock child is resistance to the policy? In China, yes, because that resulted in the fine that they received by the family planning committee in China. It's because they had a child out of wedlock. In addition, what they did was later on, once his wife got pregnant again, while they were now legally married in China, they were having another child out of the policy. If marriage alone is sufficient resistance, doesn't that undo the Attorney General's 2008 decision? Doesn't that make a mere fact that something has happened to one spouse? Doesn't that automatically qualify the other spouse? Isn't that exactly what the Attorney General was trying to overrule in the 2008 decision? To some extent. I think what the issue was whether the main thing I think the Attorney General was trying to do was to prevent spouses from coming to the United States saying my wife had a forced abortion. I didn't do anything else. It looks pretty much like Lee's situation, doesn't it, that the Attorney General was concerned about, that his husband comes to the United States, wife suffers the abortion or the insertion of an IUD or whatever, stays in China with the kid. Correct. So Lee's situation is exactly what the Attorney General was concerned about. If the fact of marriage alone is sufficient to constitute other resistance, then doesn't that undo the Attorney General's decision? I think that there is a concern of showing a significant amount of resistance or a certain amount of resistance. I would submit that just the marriage, the illegal marriage in and of itself, would not be enough. And in this case, there is more resistance that the Petitioner exercised. Aside from the marriage and the child, what other resistance was there? Once his wife was pregnant with their second child, he assisted her in hiding this from the family planning in the hopes of giving birth to a second child in violation of the law. And when they were discovered, he resisted by virtue of trying to stop them from dragging his wife out of the house to the hospital for the forced abortion. He says that he was in some sort of a physical altercation with the officials who were taking his wife to the hospital for the forced abortion. Unfortunately, the record is unclear as to exactly what he did. There were three family planning officials, two police. The police stayed with the Petitioner in the house as the family planning officials were dragging his wife out of the house. And there's some evidence that he was physically restrained by the officials. Right. But as to what else he did, whether there was a fist fight or anything. No, no. Physically restrained. Is there any ñ what connection can he draw between the land confiscation and his resistance to the family planning? Well, when he was told that the reason the land was taken was because or redistributed without his family being the only one that didn't get farmland was because of the violation of the family planning policy, and I think specifically the violation of the having ñ trying to have the second child, although technically they were a violation for having the first child. So he ñ that was a direct result of the violations. It may have taken a few years for them to redistribute the land, but that's in fact what they did and that's why they did it. Suppose they do redistribute it. I mean, in our country, if you commit a crime, the instrumentalities of the crime are subject to forfeiture. I mean, how is this any different? Why would forfeiture of land or forfeiture of your house or forfeiture of your car, your bank account, whatever, the government forfeits, how could that rise to the level of persecution? Well, I think ñ and to be honest, look, first of all, the Petitioner is a farmer. This is how he earned his income. But let's just say he were doing a ñ operating a meth lab on his ñ on his land. I mean, in the United States, he could forfeit the house, the land, the whole thing. That's correct. But I think in a situation where you have a legitimate business, which I think in this case is farming, and that is how you support your family, and that is taken away from you solely because you're in violation of the one-child policy, which the Congress has basically said is ñ I'm not saying that's a good thing to do. But I'm asking, is that the extreme kind of abuse that would constitute persecution? I think it ñ I mean, you need to look at the totality of the circumstances as the Court has done in the past. And that, along with other things that occurred that happened to him, I think would rise to the level of persecution. You're taking away his ability to earn an income to support his family in addition to the fact that, as the Court has found, the abortion itself is part of that persecution, as well as the fines that he had to incur as a result of the birth of his first child. Can you shed a little more light on the facts that are in the record? How is it that the lady who got the forced abortion is still in China and the husband is here in the United States? Can you repeat your question? Yeah. The facts seem a little curious to me, that the person who was physically taken away by officials and forced to have an abortion is still in China. But the husband, who is kind of the onlooker, he gets asylum in the United States. It seems almost 180 degrees of what you might expect. Right. And to be honest, the record doesn't reflect why it is that he's here versus his wife and child. However, obviously, if he is granted asylum, he can bring the wife and the child into the United States. He states on the record, he states that he would like to have another child. He doesn't, but I didn't see any place in the briefing that he said that he wanted to have another child with his wife. And I would submit, by the way, that if he tried to have another child in China with someone else anyway, he would be in violation since he already has a child. But let's assume he stays married, goes back to China. He and his wife are still in their 30s, are of childbearing age. This goes to Judge Silberman's question. If we were to grant him asylum, does he bring her over, or has he just got asylum and now free to marry somebody else in the United States and have the additional children that he wants? He could do either, yes. But usually – So there's nothing in the record that reflects that Lee says, if I get asylum, the first thing I'm going to do is get my wife and child out of there. Right. But that's – right. Is there anything in the record that suggests he's in contact with her? He – the record doesn't reflect that, other than she did – I believe she did submit a statement. However, you know, time does go on. Whether he's still interested in having her come over, that would certainly be an option once he's granted asylum. Or he could divorce her and marry somebody here. That's certainly up to him. But that would be the option, would be to have her and the child here in China from China. Mr. Johnson, I see you're down to about a minute or so. Would you like to reserve your final time? Yes. Okay. Thank you. Go ahead. Good morning, Your Honor. May it please the Court. John Blakely on behalf of the Attorney General of the United States. Your Honor, there's one point in time I'd like to draw your attention to. That's December 2000. This is on page 246 of the administrative record where Mr. Lee registered his marriage and then declared that everything was valid, everything was in harmony, I think was the word that he used. So anything that happens prior to that point is irrelevant to any of the analysis that we have, because everything was fine then. If you look afterwards, the question then is, do we have persecution, that's harm, on account of his other resistance? And the immigration judge decided here that there was not persecution. No harm was done. The IJ did not have the benefit of our decision in Zhang. How does Zhang affect the analysis here? Well, I think Mr. Johnson had a pretty hard time about the marriage and the child, but that looks like that's exactly what our Court said. Well, I think Zhang speaks to the specific circumstances that were addressed in Zhang, because as far as what defines other resistance, that's for the Board to define. Yeah. But we said in Zhang that we had prior, we had decisions that were prior to the Attorney General's 2008 decision that indicated that the mere fact of marriage or the mere fact of having a child constituted resistance. Oh, that aspect of Zhang, I agree with 100 percent, Your Honor. It just affirms and it says that the Attorney General's decision stands on whether an individual who ---- Okay. So the mere fact, so you agree, you're agreeing then that the mere fact of marriage constitutes resistance? I don't think Zhang says that, Your Honor. No, I believe it does in its analysis. It says we're going to recognize the Attorney General's 2008 decision and then holds it up very, very narrowly and says we've got prior decisions that indicate that in, where we have family planning, you know, these draconian family planning policies, that the mere fact of marriage and the mere fact of having a child is evidence of resistance. This is why I asked Mr. Johnson. That seems to undo the Attorney General's decision, but that's what we said. Shouldn't we remand this case back to the BIA for reconsideration in light of our decision in Zhang? I don't think that's necessary, Your Honor, because you look at the totality of the circumstances for what all is considered in this. And I think if you look at the sequence of events in Nei Jiang and you look at the sequence of events here, there's some very stark differences in what happened. I agree that there's some similarities. You have two individuals who start out getting together when they're, they start living together without proper registration, without a proper marriage, and then they both end up getting pregnant. But there are completely different responses from the government on this. And with Zhang, you never have a period of time where they say they're in harmony with the government. In this case, the only persecution, there's no persecution prior to the valid registration of the marriage. Now, please address separately what constitutes resistance and what constitutes persecution on account of resistance. It seems to me as I read Zhang, it's pretty much on all fours with this case. That is to say, if there was resistance in Zhang and were bound by our prior precedent, I have trouble seeing how there was not resistance here. So I'm not talking yet about persecution. I'm talking only about resistance. How is the resistance here any less than in Zhang? Well, one, it's separated in time. What is separated in time? The resistance that you're referring to in this case. In Zhang, it was a sequence of events that was close in time together. Here you're talking about a five-year period of time. They got married in 97, and the forced abortion was in 2002. That's where the real source of the other resistance here. You have a period of time after that resistance where everything is fine. The government never had a problem. I don't have a problem with any sort of resistance you could attach to the prior marriage. You know, I have trouble. I'll just say for myself, I have great trouble distinguishing what happened here in Zhang and what happened here and what happened in Zhang. And for my money, with respect to resistance, I would remand for reconsideration in light of Zhang. The Board didn't have the benefit of, I say that in conclusion. Well, the Board did, but, I mean, Zhang came out after, I mean, before the Board decided, they just didn't deal with it. They just adopted the IJ's ruling, which wasn't. I'm sorry. Your Honor, what I'd like to draw your attention to is that neither the IJ nor the Board here say that that marriage was not other resistance. Forget the marriage for a second. What about the fact that he's fighting with the officials who are carting off the wife? Is that resistance? Certainly. It is some resistance. Well, what do you mean by some resistance? Isn't that enough? How much resistance do you need? The finding, and I don't know the answer to that, and the Board has never spelled out exactly how much, like, is there a level of resistance that's sufficient or not. The finding in this case is there was not persecution on account of other resistance. And there wasn't a separate analysis on exactly whether there was resistance, what was included, what was not. And they just said there's no persecution on account of resistance. We have a period of time where the Petitioner assumes, states that he's happy with everything. And then we have some events that happen after that. And then he says he was persecuted because of that. And so what we look at here is what other resistance did he establish after he says everything was fine between him and the government? The only form of resistance that he has is the altercation when his wife was taken for a forced abortion. Let me ask you a variant of Judge Fletcher's question. When the I.J. had the case, Jang had not yet been decided. Your Honor, I have to look at the exact date. The I.J. decided the case in December of 2008. And I think Jang was in 2010. Jang came out in 2010. Then you're right, Your Honor. Okay. Then the BIA had the case in after Jang came out in July of 2010. The BIA had the case in September 2010 and just affirms without opinion. It makes no reference to Jang. So following up on Judge Fletcher's question, why shouldn't we ask the BIA to go back and reconsider the case under Jang? Maybe they'll distinguish it. Maybe they won't. But they didn't. I mean, this Court could certainly ask it to re-go. I would suggest that the Board's response is going to be exactly the same. No, no. It can't be the same because they – I mean, I doubt it could be the same because they affirm without opinion, without making any reference to the after-decided case. So they either have to say this case doesn't apply because, or yes, it does apply and we distinguish it or whatever. Well, the question is, in this case, was there persecution on account of other resistance? And looking at the totality of the circumstances, I think we can very easily set this case right next to Najang and just ask the simple question of, is there persecution on account of other resistance? Does the record evidence compel a conclusion contrary to what the Board reached  And I would suggest that no, not at all. What bothers me about the analysis of does it compel a conclusion other than what the Board reached is, I misspoke and Judge Silverman exactly has the sequence correct. We get a one-liner from the BIA in September 2010. Jang comes out in July 2010, which gives us a very strong reason to think that the BIA was not aware of Jang. So to give the Board the presumption that comes from, we know you thought about it and so on, that is to compel, I just don't think they were aware of it. I think we should be careful suggesting that the Board ignored this Court's ruling in any decision. Well, I don't mean ignore it in the sense of they read it and they blew it off. I mean it in the sense that I suspect they were not aware of it. Your Honor, the presumption is that they were aware of it. And there's no reason to think looking at the facts of this case. Well, if they were aware of it, they disregarded it then. So that doesn't augur well for the Board. Your Honor, if I could ask your indulgence for a moment. If you can just allow me to compare the facts, compare and contrast the facts in the two cases. I think you can see that they are, in fact, very different. In Nai Jang, what seemed key to this Court was that there was a persistent persistence in the actions of the couple. There's no persistence in the acts of this case. In Nai Jang, all the actions are compressed into a short period of time. They're spread out here. In Nai Jang, when they asked for the registration, the family claim authorities immediately stomped on that. And they went to the home and they arrested him and they detained him and they interrogated her and they examined her. They found out she was pregnant and they took her to court. All of these may be really good reasons for distinguishing Jang. I just don't see that the Board did any of that. And the I.J. couldn't have done that. And since the BIA said it was affirming on the basis of the I.J.'s opinion, I don't know how we can get there. We can get there in this way, Your Honor. The immigration judge is required to reach a decision that complies with this Court's ruling. It doesn't have to. Yeah, but he didn't have the benefit of the ruling, counsel. That's the whole problem. But, Your Honor, with the facts of this case — These are arguments that should be — that are maybe perhaps well made and may be persuasive to the Board of the I.J. But if the I.J. couldn't have considered our decision and the BIA says, subsequent to our decision, we're affirming on the basis on which the I.J. decided this, then the BIA has adopted word for word what the I.J. did. But the I.J. did not say here that he did not consider the marriage as part of the resistance. And he didn't say what the effect was of the difference in the period of time. And I think what's important for this Court should be, is there persecution on account of other resistance? I think the record evidence here, with the stark contrast with how the family planning authorities act in this case, establishes that there's nothing to compel reversal, and no time out of time. Roberts. Thank you, Mr. Blakely. Mr. Johnson, I think you had about a minute left. Johnson. One thing I wanted to point out is that while there is a period of time where everybody seems to be happy, the facts of the matter is that the Petitioner's wife was forced in after marriage to get an IUD, which had come out causing the second pregnancy. After the abortion, she again had to be forced to have an IUD. So I'm happy from the sense that they didn't perhaps have to endure the wrath of family planning, but they were clearly forced and in a situation where she was required to have an IUD inserted. And the record doesn't reflect it, but I'm guessing she still has an IUD as a requirement of the one-child policy. So I don't think it's as happy a situation. I do think that under the Court's ruling that this would be a very similar situation, perhaps longer in length, but clearly they wanted a child, they knew it was a violation of the law, and they were going to do whatever they could do to have it, whether it's the first time when they actually succeeded by hiding out in the aunt's place and having this child, or in the second case, unfortunately being caught and having to go through a forced abortion. That's enough resistance, I think. Thank you very much, Mr. Johnson. Mr. Blakely, thank you. The case is discharged.
judges: Silverman, Fletcher, Bybee